# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs July 19, 2016

## STATE OF TENNESSEE v. MERVAN EYUP IBRAHIM

**Appeal from the Criminal Court for Davidson County**
**No. 2012-D-3544     J. Randall Wyatt, Jr., Judge**

---

**No. M2015-01360-CCA-R3-CD – Filed August 22, 2016**

---

Following a jury trial, the Defendant, Mervan Eyup Ibrahim, was convicted of two counts of aggravated rape, a Class A felony. See Tenn. Code Ann. § 39-13-502. The trial court subsequently sentenced the Defendant to twenty-five years' incarceration to be served at one hundred percent. In this appeal as of right, the Defendant contends (1) that the evidence was insufficient to sustain his convictions because the State failed to prove that the victim suffered a bodily injury; (2) that the trial court erred in denying his motion to suppress his interview with the police; (3) that the trial court erred in admitting the audio recording of a 911 call; (4) that the trial court erred in allowing a witness to read, verbatim, portions of a report made during a forensic medical examination of the victim and in admitting that report into evidence; (5) that the trial court erred in denying his motion for a mistrial after one of the witnesses stated that the Defendant "had engaged in the illegal sale of marijuana and the illegal acquisition of Xanax pills" on the night of the offenses; and (6) that the State committed prosecutorial misconduct during its rebuttal closing argument. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and TIMOTHY L. EASTER, JJ., joined.

David Harris (at motion for new trial hearing and on appeal); and Patrick T. McNally (at trial), Nashville, Tennessee, for the appellant, Mervan Eyup Ibrahim.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Amy Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

FACTUAL BACKGROUND

The victim, J.L.,[1] testified at trial that in November 2012, she was "living a nomadic lifestyle," addicted to the opioid Dilaudid, "recreationally" using cocaine, and "would prostitute sometimes" to support her addiction. J.L. testified that she had been prostituting herself for "a couple of months" on Dickerson Road in Nashville and that the area was "known" for prostitution. J.L. stated that on November 12, 2012, she was picked up by a man on Dickerson Road, she went to the man's house, she performed oral sex on the man in exchange for forty or sixty dollars, and the man drove her back to Dickerson Road. J.L. testified that she "only had one date that night" because she "had gotten the money that [she] needed" to buy more Dilaudid. According to J.L, she walked along Dickerson Road for three or four hours after the man dropped her off because she was planning to meet a friend later.

At some point, the Defendant[2] got J.L.'s attention and offered her a ride in his "green GMC Jimmy." J.L. testified that she did not know the Defendant, but she did not hesitate to get in the Defendant's SUV because "[i]t was really cold" that night. According to J.L., she and the Defendant started "talking about partying," and the Defendant "mentioned that he could get some Xanax." J.L. told the Defendant that "it sounded . . . good to [her]." J.L. explained that she "really didn't have anything else to do . . . [and the Defendant] was talking about having a good time and drinking and getting some Xanax and [she] didn't see any reason not to" go with him. J.L. testified that at no point did she discuss having sex with the Defendant and that he never offered her drugs or money in exchange for sex.

The Defendant offered to buy J.L. a beer. J.L. accepted, and they stopped at a gas station where the Defendant purchased the beer and talked to someone J.L. did not know. After stopping at the gas station, J.L. believed that they "were going to [the Defendant's] friend's house to hang out and buy some Xanax and drink a beer." The Defendant eventually took her to a house on Eckhart Drive. The Defendant got out of the SUV and told her to give him "a minute." J.L. testified that she assumed the Defendant "was checking to see if his friend was home." The Defendant returned and said, "[I]t's cool, come on." J.L. recalled that as she and the Defendant walked to the front door, the Defendant said that "the electricity [was] off" inside the house.

J.L. testified that "as soon as the door [shut]," she realized "it was a vacant house." There was no furniture in the house; J.L. recalled only seeing empty beer cans and other

---

[1] It is the policy of this court to refer to victims of rape by their initials.

[2] J.L. admitted that she was shown two photographic lineups and that she was unable to identify her attacker. However, J.L. identified the Defendant in court as the man who attacked her.

trash. According to J.L., the Defendant's demeanor changed once the door closed. The Defendant grabbed her hair, said, "Come on, b---h," and "pull[ed] [her] up the stairs." J.L. testified that "[i]t hurt" when the Defendant pulled her hair. J.L. further testified that she "was in complete shock" and "was just kind of going with it because [the Defendant] was dragging [her]." The Defendant took J.L. into an empty bedroom and demanded, "[B]---h, you get undressed."

Once J.L. undressed, the Defendant pulled her into a bathroom, put his hands on her shoulders, "shoved [her] on [her] knees," and "stuck his penis in [her] mouth." J.L. testified that she was crying, shaking, telling the Defendant no, and trying to back away. The Defendant "smacked [her] two or three times with [his] open hand" and said, "Whose your daddy? B---h, you're mine now. If you do what I say I won't hurt you. I won't kill you." J.L. tried to back away again, and the Defendant "grab[bed] the back of [her] head and shove[d] . . . his penis down [her] throat." J.L. gagged and "actually threw up a little bit." The Defendant responded by saying, "Yeah, b---h, I want you to throw up."

After J.L. vomited, the Defendant told her to stand up and "put [her] hands on the wall over the toilet." J.L. testified that she was terrified, that she repeatedly told the Defendant "no," and that she was crying and shaking the whole time. J.L. further testified that she "freaked out" when she realized that the Defendant was about to "stick his penis . . . in [her] anus." J.L. told the Defendant that she did not "do that" and that she "physically [could not] do that." The Defendant responded by saying, "What b---h" and then "did it anyway." J.L. testified that it hurt when the Defendant penetrated her anus but that "thank God[,] it didn't last as long as [she] thought it would." She quickly heard the Defendant say, "Damn, girl, I came all over you." J.L. testified that she could feel "[h]is cum all over [her]."

J.L. then sat down on the toilet, crying, and asked the Defendant if she could put her clothes back on because she was "freezing." The Defendant told her "no." After the Defendant got dressed, he went in the other room and "was going through [her] stuff." The Defendant came back into the bathroom and told her not to leave the house until after he did. J.L. testified that she heard the Defendant "speed off" and watched from the bathroom window as the Defendant drove away. J.L. was able to find her clothes and get dressed. J.L. discovered that her money was gone. J.L. could not find the door, so she opened a window, pushed out the screen, and "tumbled out" onto a bush.

J.L. ran to the first house she saw with "a big flood light" on. J.L. "[b]anged on the door" until a man answered. J.L. was "crying [and] telling him [that she] had just been raped." The man called 911 for her, and the police arrived shortly thereafter. J.L. was taken to a hospital where a forensic medical examination was performed on her. J.L. had a scratch on her left arm from breaking the screen out of the window. J.L. testified

-3-

that she experienced pain while the Defendant penetrated her anus and that her anus hurt for "about a week." J.L. also testified that her head "hurt a little bit" from being hit and that it hurt until she was "able to go home and sleep."

Tucker Daniel testified that he lived near the vacant house on Eckhart Drive. Mr. Daniel recalled that on November 12, 2012, the victim "was knocking pretty loudly" and "with a sense of urgency" on his door. When he saw the victim standing outside, Mr. Daniel noticed that she "seemed pretty distressed." Mr. Daniel explained that she "kept looking over her shoulder, . . . kind of looking back and forth." When he opened the door, the victim said that she had been raped and asked Mr. Daniel to call 911. Mr. Daniel testified that the victim "was very shaken up," seemed "really panicked" and "very scared," and acted like she "didn't want to stand outside any longer." Mr. Daniel let the victim inside while he called 911. Mr. Daniel testified that he did not know the victim and had not seen her since that day.

An audio recording of the 911 call was played for the jury. At several points during the recording, J.L. can be heard crying in the background. Mr. Daniel begins the call by saying that "a lady just came to [his] door and said that she was raped." Mr. Daniel gave his address and a description of J.L. to the 911 operator. Mr. Daniel stated that J.L. was "pretty messed up, pretty upset." The 911 operator then began to ask several question which J.L. could hear. J.L. could be heard in the background answering the questions, followed by Mr. Daniel's repeating the answers back to the 911 operator. At one point, J.L. stated that she was "held hostage in that vacant house over there." J.L. also stated that she did not know the rapist because she had just met him but that she thought his name was M.J. J.L. provided the 911 operator with a physical description of the Defendant and his SUV.

Kristi Smith testified that she was a friend of the Defendant's and that she had an "interaction" with him at a gas station on November 12, 2012. Ms. Smith recalled that she saw J.L. with the Defendant that night. Ms. Smith testified that she did not know J.L. and that she had not seen her before or after November 12, 2012. Photographs from the gas station's surveillance system were entered into evidence at trial. The photographs showed the Defendant's SUV at the gas station, the Defendant's and Ms. Smith's speaking to each other inside the gas station, and the Defendant's purchasing a beer.

Officers searching the vacant house on Eckhart Drive found one of the windows open with the screen torn off. They also found several beer cans, used condoms, and condom wrappers. The officers collected three used condoms, three beer cans, some condom wrappers, a toothbrush, and a cigarette butt from the house. Two swabs of the bathroom floor were also taken.

-4-

Connie Barrow testified that she was a women's health nurse practitioner at Nashville General Hospital. Ms. Barrow performed a forensic medical examination of the victim on November 12, 2012. Ms. Barrow recalled that J.L. "was calm and collected" and even "laughed . . . at times" during the examination. Ms. Barrow noted that "there [was] an extremely wide gamut of ways that people present . . . emotionally" after a trauma like rape. Ms. Barrow testified that there were no marks or bruises on J.L.'s face, neck, breasts, back, or buttocks. Ms. Barrow also noted that there were no injuries to J.L's scalp. However, Ms. Barrow testified that it was possible to feel pain "without whatever caused the pain leaving a mark." Ms. Barrow recalled that there were some scratches on J.L.'s stomach and thighs along with a scratch on one of her arms.

Ms. Barrow took swabs from the victim's mouth, labia, perianal, and anus for subsequent forensic testing. Ms. Barrow observed redness around the victim's anus and "some tenderness there." Ms. Barrow recalled that J.L. jerked away from her when she first attempted to insert the swab into her anus. Ms. Barrow testified that she asked J.L. when the last time was that she had voluntary sex. J.L. responded that she had oral sex "earlier that evening." Ms. Barrow testified that J.L. tested positive for benzodiazepine and cocaine.

Ms. Barrow was allowed to read verbatim from the narrative portion of her report. This portion of the report detailed the victim's statements about what had happened that night, beginning with when the Defendant picked her up on Dickerson Road. Much of it was consistent with J.L.'s testimony at trial, including her description of the attack inside the Eckhart Drive house. The narrative also included statements that the Defendant and J.L. "chit-chatted about pot and pills," that the Defendant "got some Xanax," and that the Defendant "sold some pot to some people in the parking lot" of the gas station.

Subsequent forensic testing by the Tennessee Bureau of Investigation revealed the presence of sperm on the anal, perianal, and labia swabs taken from the victim. Sperm and blood were also found on the victim's jeans. A DNA profile was recovered from the sperm found on the anal swab of the victim, and it matched the Defendant's DNA profile. The other swabs were not tested for DNA. The forensic scientist who performed the DNA analysis testified that she started with the most "intimate sample" and stopped if she received a positive result, assuming that the sperm on the other samples came from the same individual. No forensic testing was performed on any of the items taken from the Eckhart Drive house.

Detective Jason Mayo of the Metropolitan Nashville Police Department testified that he interviewed the victim on November 12, 2012. Det. Mayo recalled that J.L. "got upset a couple of times, cried a few times, was okay for some part of it, but seemed coherent and understood what was going on at the time." Det. Mayo also recalled that J.L. appeared to be in pain and "was having trouble sitting." Det. Mayo testified that he

searched the victim's clothes while she was being examined by Ms. Barrow and did not find any money. Det. Mayo admitted that he showed the victim two photographic lineups. The first photographic lineup did not include the Defendant. J.L. picked someone out of that lineup, but Det. Mayo testified that he did not consider that an identification because she said she was only sixty-percent sure. J.L. was unable to pick the Defendant's picture out of a second lineup. Det. Mayo testified that he interviewed the victim several times and that her story did not change.

Det. Mayo also interviewed the Defendant. An edited recording of Det. Mayo's interview with the Defendant was played for the jury. When Det. Mayo told the Defendant that he was investigating a rape, the Defendant denied raping anyone but admitted to frequenting prostitutes. Det. Mayo showed the Defendant a picture of the house on Eckhart Drive. The Defendant denied ever being at the house and said that he had never seen the house. Det. Mayo also showed the Defendant a picture of his SUV from the gas station surveillance footage and asked if there was a woman with him that night. The Defendant responded that there was not because "ain't no female been in that new car." Det. Mayo showed the Defendant a picture of J.L., and the Defendant denied knowing her.

Det. Mayo then asked the Defendant why they would have found his DNA at the Eckhart Drive house. The Defendant immediately responded that it was because he had "f--ked a couple prostitutes in that house before." The Defendant estimated that he had taken at least ten women to that house in the past. The Defendant explained that he would just leave his used condoms in the house and stated that all of the condoms found in the house were probably his. The Defendant initially stated that it had been several months since he had taken a woman to the Eckhart Drive house. However, when Det. Mayo asked the Defendant if he had done so in the last few weeks, the Defendant immediately responded that he had.

Still, the Defendant denied that it was the victim. Instead, the Defendant claimed that it was an older prostitute, around forty-five years old, that he knew. The Defendant claimed that he picked this woman up at a gas station near the Eckhart Drive house. The Defendant continued to deny knowing the victim. Det. Mayo then asked the Defendant why his DNA was found on the victim. The Defendant responded that he "probably done f--ked her." The Defendant said that he was not sure if he had picked up J.L. because he "picked up a lot of girls" and that he did not "remember her face in the last two weeks." The Defendant explained that he "holler[ed] at a lot a girls . . . whether they prostituting or not" because he was "just a nutter . . . [and he] just want[ed] to nut."

Det. Mayo then turned the conversation back to the gas station on November 12, 2012. The Defendant said that he did not remember buying a beer that night, but if he did it was probably for a woman in his SUV. The Defendant then denied that he told Det.

Mayo at the start of the interview that there had never been any women in the SUV. The Defendant admitted to selling ten dollars' worth of marijuana at the gas station. The Defendant stated that he did not remember having a woman with him or going to the Eckhart Drive house to have sex that night. However, the Defendant stated that if he was on the surveillance video buying a beer, then he probably did have a woman with him that night. The Defendant explained that he would typically purchase a beer for prostitutes before taking them to the Eckhart Drive house to have sex.

The Defendant then offered that he had probably purchased the beer for the older prostitute he had mentioned earlier. The Defendant reiterated that J.L. was not in his SUV that night. Det. Mayo then asked why his DNA would be on the victim "that night." The Defendant responded that he had no idea but that "DNA don't lie." The Defendant again stated that he did not remember picking up J.L. and that was probably because he had "done picked up a lot of girls." Det. Mayo then confronted the Defendant with the graphic details from J.L.'s statement. At that point, the Defendant admitted to taking J.L. to the Eckhart Drive house but claimed that he had paid her twenty dollars to have sex with him. The Defendant denied having anal sex with the victim and then immediately said that he "probably might a have, though."

The Defendant claimed that he did not initially recognize the picture of J.L. that Det. Mayo had shown him because J.L. looked "junked out" the night he picked her up. The Defendant also theorized that he could not remember the victim because he frequently used marijuana. The Defendant admitted to picking up J.L. on Dickerson Road and that he "was a little aggressive to her." However, the Defendant denied raping the victim. The Defendant insisted that he paid J.L. twenty dollars in exchange for the sex acts she performed. Det. Mayo asked the Defendant why he thought J.L. would lie about being raped. The Defendant responded that it was because he was so "good looking" and that she was not.

Det. Mayo confronted the Defendant with the fact that he did not find any money in the victim's clothes on November 12, 2012. The Defendant again insisted that he gave the victim twenty dollars. The Defendant said that he did not know what the victim did with the money and suggested that she probably bought crack cocaine with it. Later, the Defendant claimed that J.L. was lying about being raped because he left the house without paying her. The Defendant said that he had done that to prostitutes in the past and did it to J.L., even though he had insisted earlier in the interview that he had paid her. Det. Mayo then told the Defendant that the victim had said that she had never been anally penetrated before and that she had injuries to her anus. The Defendant responded by saying, "She's a prostitute, I know I ain't the first one in her ass." The Defendant concluded the interview by insisting that he "did not rape [that] ho."

At the conclusion of its proof, the State made the following election of offenses: Count 1 involved the Defendant's penetrating J.L.'s mouth with his penis, and Count 2 involved the Defendant's penetrating J.L.'s anus with his penis. Based upon the foregoing evidence, the jury convicted the Defendant of two counts of aggravated rape. At a subsequent sentencing hearing, the trial court sentenced the Defendant to twenty-five years' incarceration, to be served at one hundred percent, for both convictions. The trial court ordered the sentences to be served concurrently, for a total effective sentence of twenty-five years. This timely appeal followed.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to sustain his convictions for aggravated rape. Specifically, the Defendant argues that the State failed to prove that J.L. suffered a bodily injury during the offenses because there was no evidence of physical injuries to accompany J.L.'s testimony that she was in pain while she was raped. The State responds that the evidence was sufficient to sustain the convictions for aggravated rape.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence, rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The foregoing standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Both "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." State v. Dorantes, 331 S.W.3d 370, 381 (Tenn. 2011). The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

Aggravated rape "is unlawful sexual penetration of a victim by the defendant . . . accompanied by . . . [t]he defendant caus[ing] bodily injury to the victim." Tenn. Code Ann. § 39-13-502(a)(2). As pertinent to our review, the definition of "sexual penetration" includes fellatio and anal intercourse. Tenn. Code Ann. § 39-13-501(7). The Defendant does not challenge the jury's conclusion that he unlawfully penetrated the victim's mouth and anus. Instead, the Defendant contends that his unlawful sexual penetration of the victim was not accompanied by his causing a bodily injury to her. "Bodily injury" is statutorily defined as including "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty." Tenn. Code Ann. § 39-11-106(a)(2) (emphasis added).

This court has previously held that a victim's testimony that she felt pain as a result of the defendant's actions was sufficient to establish a bodily injury. See State v. Smith, 891 S.W.2d 922, 928 (Tenn. Crim. App. 1994) (holding that the victim's statements that she suffered physical pain when the defendant "placed his entire body weight on" her chest and penetrated her vagina was sufficient to establish a bodily injury); State v. Terry Clark, No. M2003-01925-CCA-R3-CD, 2004 WL 315141, at *2 (Tenn. Crim. App. Feb. 19, 2004) (holding that the victim's testimony that the defendant's kick to his leg "did hurt at the time" was sufficient to establish a bodily injury); cf. State v. Norman McDowell, No. W2014-00301-CCA-R3-CD, 2015 WL 554873, at *5 (Tenn. Crim. App. Feb. 10, 2015) (holding that the victim's testimony that she felt "throbbing inside" during rape by itself "fail[ed] to rise to the relatively low threshold of proving physical pain").

Here, J.L. testified that "[i]t hurt" when the Defendant pulled her hair to drag her upstairs. J.L. also testified that the Defendant "smacked [her] two or three times with [his] open hand" while he forced his penis inside her mouth. J.L. testified that her head "hurt a little bit" from being hit and that it continued to hurt until she was "able to go home and sleep." J.L. further testified that the Defendant "grab[bed] the back of [her] head and shove[d] . . . his penis down [her] throat" until she gagged and regurgitated. While Ms. Barrow testified that she did not see any marks or bruises to J.L.'s face or

-9-

scalp, J.L.'s testimony alone was sufficient to establish that she felt physical pain while the Defendant penetrated her mouth.

J.L. testified that she "freaked out" when she realized that the Defendant was about to penetrate her anus. J.L. told the Defendant that she "physically [could not] do that." J.L. testified at trial that it hurt when the Defendant penetrated her anus and that her anus hurt for "about a week" afterward. Ms. Barrow testified that she observed redness around J.L.'s anus and "some tenderness there." Ms. Barrow further testified that J.L. jerked away from her when she attempted to insert a swab into J.L.'s anus. Det. Mayo testified that J.L. appeared to be in pain and "was having trouble sitting" when he spoke to her on November 12, 2012. As such, there was sufficient evidence that J.L. felt physical pain accompanying the Defendant's penetration of her anus. Accordingly, we conclude that the evidence was sufficient to sustain the Defendant's convictions for aggravated rape.

*II. Motion to Suppress*

The Defendant contends that the trial court erred in denying his motion to suppress his interview with Det. Mayo. The Defendant argues that he did not knowingly and intelligently waive his rights under Miranda v. Arizona, 384 U.S. 436 (1966), because when he signed the rights waiver form he believed that he was going to be questioned "about a pending stalking case" rather than this case. The State responds that the Defendant "unambiguously understood and waived [his] rights" and that Det. Mayo cleared "any initial confusion about the offense at issue" up "quickly."

Prior to trial, the Defendant filed a motion to suppress his interview with Det. Mayo. The Defendant's motion stated that the Defendant was arrested on December 1, 2012, on unrelated charges. The motion further stated that after the Defendant was booked into the Davidson County Jail, he was served with an outstanding warrant charging him with stalking. Det. Mayo interviewed the Defendant on December 3, 2012. The Defendant's motion alleged that when he was advised of his Miranda rights and signed the rights waiver form, he believed that Det. Mayo "was going to question him about the stalking case."

The video recording of Det. Mayo's interview with the Defendant was played for the trial court. The video begins with the Defendant's telling Det. Mayo that he knew what he was there to talk about because he saw the victim's name on Det. Mayo's paperwork.[3] Det. Mayo then told the Defendant that he did not have to talk, and the Defendant responded that he wanted to. Det. Mayo reviewed the rights waiver form with the Defendant, and the Defendant signed the form.

---

[3] The victim in the stalking case and the victim in this case had the same first name.

At that point, Det. Mayo asked the Defendant if he knew what they were going to talk about. The Defendant responded that it was about his stalking case. Det. Mayo informed the Defendant that he was investigating a rape, and the Defendant responded that he had no idea then what it was about because he had never raped anyone. At no point after that did the Defendant object to Det. Mayo's continued questioning or attempt to invoke his Miranda rights.

In denying the Defendant's suppression motion, the trial court acknowledged that the Defendant "first thought the detective wanted to talk to him about a stalking case." However, the trial court found that Det. Mayo "did not attempt to deceive [the Defendant] or mislead him about that and immediately and clearly explained that he wanted to talk about a sexual assault case." The trial court further found that the Defendant "chose to continue the interview." The trial court concluded that "based on the video[,] . . . [the] choice was freely made by the [D]efendant in his own volition."

On appellate review of suppression issues, the prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." Id. Conversely, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id.

A defendant's statements "made during the course of [a] custodial police interrogation are inadmissible as evidence in a criminal case unless the State establishes that the defendant was advised of certain constitutional rights and waived those rights." State v. Anderson, 937 S.W.2d 851, 853 (Tenn. 1996) (citing Miranda, 384 U.S. at 444)). There is no dispute that the Defendant was in police custody when Det. Mayo interrogated him. Nor is there any dispute that Det. Mayo advised the Defendant of his Miranda rights and that the Defendant freely signed a rights waiver form. Rather, the Defendant contends that this waiver was not effective because, at the time he made the waiver, he mistakenly believed that he was going to be questioned about a stalking case.

Contrary to the Defendant's argument, "the failure of law enforcement officials to inform a suspect of all the possible subjects of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his or her Fifth Amendment privilege." State v. Green, 995 S.W.2d 591, 600 (Tenn. Crim. App. 1998) (citing Colorado v. Spring, 479 U.S. 564 (1987)). Likewise, Miranda "does not require

-11-

the interrogating officers to advise a defendant of the nature of the crime under investigation." Id. (quoting State v. Stearns, 620 S.W.2d 92, 95 (Tenn. Crim. App. 1981)) (internal quotation marks omitted). Nor does Miranda require that a suspect be "informed of the purpose and scope of the pending investigation." State v. Kristin M. Meyers, No. E2012-00494-CCA-R3-CD, 2013 WL 1094981, at *7 (Tenn. Crim. App. Mar. 18, 2013).

While the Defendant initially believed that Det. Mayo was there to question him about a stalking case, Det. Mayo "immediately and clearly explained that he wanted to talk about a sexual assault case." The Defendant voluntarily, knowingly, and intelligently waived his Miranda rights prior to being informed that Det. Mayo was investigating a rape. The Defendant did not object to Det. Mayo's continued questioning or attempt to revoke his waiver after being informed about what Det. Mayo was investigating. As such, the trial court did not err in denying the Defendant's suppression motion. Accordingly, we conclude that the Defendant is not entitled to relief on this issue.

### III. 911 Call

The Defendant contends that the trial court erred in admitting the audio recording of Mr. Daniel's 911 call. The Defendant argues that the trial court erred in concluding that the recording was admissible hearsay under the excited utterance exception because Mr. Daniel was "not the victim." The Defendant additionally argues that the recording "was cumulative" and that its probative value was substantially outweighed by the danger of unfair prejudice because the victim could be "heard crying in the background." The State responds that the statements of both Mr. Daniel and J.L. heard on the recording were excited utterances and, therefore, admissible as an exception to the prohibition against hearsay. The State further responds that the recording was neither cumulative nor unfairly prejudicial.

Prior to trial, the Defendant filed a motion to exclude the audio recording of Mr. Daniel's 911 call, arguing that the "[s]tatements by Mr. [Daniel] recorded on the 911 tape [did] not fall within a hearsay exception." The motion also argued that the 911 recording had no probative value, was unfairly prejudicial because J.L. could be heard in the background crying, and was "needless[ly] cumulative evidence." The trial court overruled the Defendant's motion and concluded that the statements on the recording met the excited utterance exception to the hearsay rule. The trial court concluded that "to get [the] type of information at his front door at 8:53 p.m." that Mr. Daniel did "would cause somebody to be a little bit excited."

"Hearsay" is defined as "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

asserted." Tenn. R. Evid. 801(c). A "statement" is "(1) an oral or written assertion or (2) nonverbal conduct of a person if it is intended by the person as an assertion." Tenn. R. Evid. 801(a). Hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid. 802. The questions of whether a statement is hearsay or fits under one of the exceptions to the hearsay rule are questions of law and subject to de novo review by this court. Kendrick v. State, 454 S.W.3d 450, 479 (Tenn. 2015), cert. denied, 136 S. Ct. 335 (2015).

One exception to the prohibition against hearsay evidence is for excited utterances. An excited utterance is "[a] statement relating to a startling event or condition made while the declarant was under the stress or excitement caused by the event or condition." Tenn. R. Evid. 803(2). J.L.'s statements clearly satisfied these requirements. This court has previously held that rape is a startling event or condition for purposes of the excited utterance exception. State v. Person, 781 S.W.2d 868, 872 (Tenn. Crim. App. 1989). J.L. testified that she immediately ran to Mr. Daniel's house after she escaped the vacant house and that she was crying and "[b]ang[ing]" on his door. Mr. Daniel testified that J.L. "seemed pretty distressed," "very shaken up," "really panicked," and "very scared." J.L. can be heard crying during portions of the 911 recording, and Mr. Daniel stated on the recording that she was "pretty messed up, pretty upset." Accordingly, we conclude that her statements were admissible under the excited utterance exception.

The crux of the Defendant's argument is that the entire 911 recording was inadmissible because Mr. Daniel was not a victim; therefore, his statements could not be excited utterances. We note that, while "the 'startling event' is usually the act or transaction upon which the legal controversy is based . . ., a subsequent startling event or condition which is related to the prior event can produce an excited utterance." State v. Gordon, 952 S.W.2d 817, 820 (Tenn. 1997). As such, our supreme court has held that when a person is visibly upset and announces that they have been the victim of a violent crime, "that announcement is a 'startling event' sufficient to suspend the normal, reflective thought process of [a] person who hears it." State v. Franklin, 308 S.W.3d 799, 824 (Tenn. 2010). As such, Mr. Daniel's statements, made shortly after J.L. knocked on his door and told him that she had been raped, were also admissible under the excited utterance exception.

The Defendant also submits that the audio recording of the 911 call was unfairly prejudicial and cumulative. Specifically, he argues that the recording was cumulative in nature because both J.L. and Mr. Daniel testified at trial and that "the recording's probative value was substantially outweighed by the danger of unfair prejudice because [J.L.] can be heard crying in the background." Tennessee Rule of Evidence 403 prohibits the introduction of even relevant evidence "if its probative value is outweighed by the danger of unfair prejudice . . . or by considerations of . . . needless presentation of

-13-

cumulative evidence." The victim was admittedly a prostitute, and the Defendant presented a defense of consent. Here the 911 recording was relevant to portray J.L.'s emotional state immediately following the sexual encounter and her credibility was a central issue in the trial. See State v. Matthew Douglas Cox, No. E1999-00351-CCA-R3-CD, 2000 WL 1562920, at *15 (Tenn. Crim. App. Oct. 20, 2000) ("We must agree with the State that the primary purpose in introducing the 911 tape recording was, to the contrary, to provide the jurors with the best possible view of P.C.'s demeanor immediately following these offenses and so enhance the jurors' ability to judge the credibility of P.C.'s accusations of rape."). Accordingly, we conclude that the trial court did not err in admitting the recording of the 911 call.

### IV. Forensic Medical Examination Report

The Defendant contends that the trial court erred in allowing Ms. Barrow to read, verbatim, portions of her report made during the forensic medical examination of the victim and in admitting that report into evidence. The Defendant argues that J.L.'s statements contained in the report were "not pertinent to medical diagnosis and treatment" and, therefore, the report was not admissible under the hearsay exception for statements made for medical diagnosis and treatment. The State responds that the portions of the report in which J.L. described the rapes and her injuries before and after they had occurred were admissible as statements made for medical diagnosis and treatment. The State further responds that the portions of the report which described the events leading up to the rapes were admissible as prior consistent statements.

During Ms. Barrow's testimony, the State sought to introduce the report from her forensic medical examination of J.L. and "to go over the report with Ms. Barrow in front of the jury." Trial counsel objected to "starting her examination by going over her report" and stated that he believed "the witness [was] the best evidence." The prosecutor asked to approach the bench and argued that the report was admissible under the hearsay exception for statements made for medical diagnosis and treatment. Trial counsel then argued that the report was simply Ms. Barrow's "report" rather than "statements that are introduced for medical purposes." The trial court overruled trial counsel's objection, concluding that the report was admissible under the hearsay exception for statements made for medical diagnosis and treatment.

The prosecutor then asked Ms. Barrow to read from a section of the report which provided a "brief description of [the] event." Trial counsel objected again, arguing that this portion of the report was hearsay and "needless accumulative redundation [sic] of the [victim's] testimony." The trial court overruled the objection "on this particular type of medical examination." Ms. Barrow then read her extensive statement on what J.L. had told her regarding the rapes. In the excerpt, J.L. described her encounter with the

-14-

Defendant, beginning with when he picked her up on Dickerson Road and ending after she escaped the Eckhart Drive house through the window.

Much of the excerpt was consistent with and tracked J.L.'s testimony at trial, including her description of the attack inside the Eckhart Drive house. The excerpt also included a statement that the Defendant "got some Xanax" and a brief statement that he "sold some pot to some people in the parking lot of the gas station." The statement about the Defendant's selling marijuana was redacted from the physical report that was entered into evidence. However, the Defendant ultimately rejected the trial court's offer to provide a curative jury instruction regarding Ms. Barrow's having read the statement during her testimony.

As stated above, hearsay is not admissible except as allowed by the rules of evidence or other applicable law. Tenn. R. Evid. 802. We review the issue of whether a trial court erred in admitting hearsay evidence under a de novo standard of review. Kendrick, 454 S.W.3d at 479. One exception to the prohibition against hearsay is for "[s]tatements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment." Tenn. R. Evid. 803(4). "However, some statements that the declarant intends to be used for diagnosis and treatment, such as statements about the cause of the symptoms, are not always admissible." State v. Williams, 920 S.W.2d 247, 256 (Tenn. Crim. App. 1995).

"[J]ust because statements are recorded as part of [a patient's] medical history does not mean that the entire history is admissible" under this exception. Williams, 920 S.W.2d at 256. Instead, "any statements in the patient's history not pertinent to medical diagnosis and treatment should . . . [be] redacted." Id. This has traditionally included "extraneous facts such as the name or identity of the perpetrator of a crime [which] have not been deemed 'reasonably pertinent' to medical diagnosis and treatment." Id. Here, J.L.'s statements, beginning with her description of the Defendant's pulling her hair and dragging her up the steps of the Eckhart Drive house to her description of injuring her arm during her escape from the house, were reasonably pertinent to medical diagnosis and treatment and were admissible. However, the remainder of the report, the statements regarding the events before the rapes and the description of the assailant, should have been redacted. See id. at 256-57.

Nevertheless, we conclude that the admission of hearsay statements contained in the forensic medical examination report was harmless error. See Tenn. R. App. P. 36(b) (providing that "[a] final judgment from which relief is available and otherwise appropriate shall not be set aside unless, considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in

prejudice to the judicial process"). This is true "in light of the other evidence in the record describing the events of the rape[s] and identifying the Defendant as the perpetrator." Williams, 920 S.W.2d at 257; see also State v. Spratt, 31 S.W.3d 587, 601 (Tenn. Crim. App. 2000) (holding that the admission of hearsay statements contained in a medical report "was clearly harmless error" when those statements "were merely cumulative of the victim's testimony at trial"). Accordingly, we conclude that this issue provides the Defendant no relief.

### *V. Mistrial*

The Defendant contends that the trial court erred in denying his motion for a mistrial after Ms. Barrow read statements from the forensic medical examination report that the Defendant "had engaged in the illegal sale of marijuana and the illegal acquisition of Xanax pills." The Defendant argues that these statements caused him to be "saddled erroneously with the specter of [being an] illegal drug purchaser and was fatal to [his] visage to the jury." The State responds that the trial court did not abuse its discretion in denying the Defendant's motion for a mistrial.

At the conclusion of Ms. Barrow's testimony, as the trial court was breaking for lunch, trial counsel moved for a mistrial. Trial counsel noted that the trial court had earlier granted his motion barring any reference to the Defendant's "criminal activity or convictions" and that Ms. Barrow had read from the forensic medical examination report J.L.'s statement that the Defendant had "sold marijuana during their entourage [sic] that night." Trial counsel acknowledged that the State "was very careful in not having [J.L. or Ms. Smith] testify about that." The prosecutor responded by noting that she had "been very careful not to illicit any testimony regarding the [D]efendant's prior criminal history or prior bad acts." The prosecutor further responded that the redacted version of the Defendant's interview, that had been approved by trial counsel and that she planned to introduce later during the trial, also contained a statement from the Defendant that he sold some marijuana that night.

The trial court denied the Defendant's motion for a mistrial, concluding that the statement about his sale of marijuana was not "a prior bad act in violation of [the pretrial] motion in limine" because it was "going on during the time that this incident was taking place." The trial court offered to provide a curative instruction to the jury, but trial counsel declined because he was afraid it would bring more attention to the statement. The statement was redacted from the physical copy of the report that was entered into evidence. Trial counsel then objected to the future introduction of the Defendant's interview with Det. Mayo. The trial court overruled trial counsel's objection. Trial counsel did not renew his objection or his motion for a mistrial when the interview was introduced into evidence during Det. Mayo's testimony.

The determination of whether to grant a mistrial lies within the sound discretion of the trial court and should be granted "only in the event a 'manifest necessity' that requires such action." State v. Hall, 976 S.W.2d 121, 147 (Tenn. 1998) (appendix). The burden of establishing a manifest necessity lies with the party seeking the mistrial. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). "The purpose for declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." Williams, 929 S.W.2d at 388. A trial court's decision regarding whether to grant a mistrial will only be overturned upon a showing of an abuse of discretion. Id.

When determining whether a manifest necessity exits, "no abstract formula should be mechanically applied and all circumstances should be taken into account." State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993). In addressing whether a mistrial was necessary because of inappropriate testimony from a witness, our supreme court has used the following nonexclusive factors: "(1) whether the State elicited the testimony, or whether it was unsolicited and unresponsive; (2) whether the trial court offered and gave a curative jury instruction; and (3) the relative strength or weakness of the State's proof." State v. Nash, 294 S.W.3d 541, 547 (Tenn. 2009).

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that person's actions were in conformity with the character trait. Tenn. R. Evid. 404(b). With respect to the Defendant's "illegal acquisition of Xanax pills," we note that the Defendant made no objection to these statements prior to or during the trial. See Tenn. R. Evid. 103(a)(1) (providing that error "may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected" and "a timely objection . . . appears of record, stating the specific ground of objection if the specific ground was not apparent from the context"). Additionally, this evidence was likely admissible as an exception to Rule 404(b) in order to provide the jury with necessary contextual background. See State v. Gilliland, 22 S.W.3d 266, 272 (Tenn. 2000).

With respect to the statement that the Defendant sold marijuana on the night of the offenses, we conclude that the trial court did not abuse its discretion in denying the Defendant's motion for a mistrial. Here, Ms. Barrow's testimony was not in response to a direct question from the prosecutor. Instead, it was a brief statement read in the middle of Ms. Barrow's lengthy narrative of what J.L. had told her about the rapes. The trial court offered to provide a curative instruction to the jury, but trial counsel rejected that offer. Also, the State's case against the Defendant was relatively strong.

Furthermore, the statement was redacted from the physical copy of the report and the only other mention of the drug sale was a very brief statement during the Defendant's interview with Det. Mayo. While trial counsel did object to that statement, he did not

renew his motion for a mistrial after it was introduced into evidence. Additionally, trial counsel's defense was based upon the fact that the Defendant had committed another crime, patronizing a prostitute. The Defendant did not object to the legion of references of his having patronized other prostitutes in the past that were contained in his interview with Det. Mayo. Accordingly, we conclude that this issue, as presented by the Defendant, has no merit.

*VI. Prosecutorial Misconduct*

The Defendant contends that the State committed prosecutorial misconduct during its rebuttal closing argument. The Defendant argues that the prosecutor "impermissibly shifted the burden of proof" during her rebuttal closing argument by stating that "the defense" had "subpoena power too" and that "the defense had the opportunity to test [physical evidence] if they wanted to." The State responds that the prosecutor's comments "were proper in [the] context" that trial counsel had insinuated during his closing argument "that the State's witnesses were incompetent or were hiding the ball."

During his closing argument, trial counsel stated that evidence taken from the Eckhart Drive house was "being ignored" by the Tennessee Bureau of Investigation. Trial counsel also criticized the forensic scientists for not attempting to obtain a DNA profile from the swabs taken from J.L.'s perianal and labia. Trial counsel stated that it was "irresponsible to stop" with the anal swab because J.L. was a prostitute who had "made statements that she . . . had sex with other men that day." Trial counsel accused the police of having "ignored things" and "excused things." Trial counsel further accused the police of not conducting "a thorough investigation," which caused "holes and gaps" in the State's case. Trial counsel concluded that pieces of evidence were not subjected to further forensic testing because the State did not "want to test" them for fear that it "might end up with a piece of the puzzle that [did not] fit" its theory of the case.

In response, the prosecutor made the following statement during her rebuttal:

. . . I want to be very very very very clear about this, I agree, the defense has no burden of proof. They don't have to put on any evidence in this case.

The burden never shifts. It's always on the State, but to stand up here and act like the State is trying to keep something from you when the defense knows good and well that they have subpoena power too, they have access to labs as well and if they wanted to - -

At that point, trial counsel objected to the prosecutor's arguing facts "outside the record." The trial court overruled trial counsel's objection, and the prosecutor continued on with her rebuttal.

A short time later, the prosecutor made the following statement:

There is no conspiracy between the TBI and the DA's office to keep evidence from you. Now, you heard the testimony of the TBI person, you know, they have got a lot of things out there that they have got to test. There is a lot of things for them to do, once they met, once they find proof that is conclusive proof this person had sex with this person [and] this person says that it was not consensual, they stopped examining it. That doesn't mean that anybody is trying to keep anything from you and once again, you know, the defense had the opportunity to test that if they wanted to.

Trial counsel again objected but argued that the prosecutor was "shifting the burden of proof to the defense." The trial court overruled the objection, and the prosecutor finished her rebuttal argument. The trial court instructed the jury that the burden of proof "never shifts, but remains on the State throughout the trial of the case," and that the Defendant was "not required to prove his innocence."

Closing arguments "have special importance in the adversarial process," and the parties "have an ancient right to make closing arguments." State v. Banks, 271 S.W.3d 90, 130 (Tenn. 2008). Closing arguments allow the parties "to present their theory of the case and to point out the strengths and weaknesses in the evidence to the jury." Id. Attorneys "should be given great latitude in both the style and the substance of their arguments." Id. at 131. This leeway often results in closing arguments in criminal cases having a "rough and tumble quality" to them. Id. (quoting State v. Skakel, 888 A.2d 985, 1060-61 (Conn. 2006)). However, while attorneys "may strike hard blows, . . . [they are] not at liberty to strike foul ones." Id. (quoting Berger v. United States, 295 U.S. 78, 88 (1935)).

"[A] prosecutor's closing argument must be temperate, must be based on the evidence introduced at trial, and must be pertinent to the issues in the case." Banks, 271 S.W.3d at 131. "A criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument." Banks, 271 S.W.3d at 131. Instead, "an improper closing argument will not constitute reversible error unless it is so inflammatory or improper that it affected the outcome of the trial to the defendant's prejudice." Id. In reviewing the propriety of a prosecutor's closing argument, this court considers:

(1) the conduct at issue in light of the facts and circumstances of the case, (2) the curative measures undertaken by the trial court and the prosecution, (3) the intent of the prosecutor in making the improper argument, (4) the cumulative effect of the improper argument and any other errors in the record, and (5) the relative strengths and weaknesses of the case.

Id.

We conclude that the State's rebuttal argument was prompted by and made in response to trial counsel's argument that law enforcement personnel should have conducted further examination of the evidence and that, therefore, no prosecutorial misconduct occurred. See State v. John Allen Payne, Martha Payne, and Roy Newberry, No. 1168, 1988 WL 82958, at *3 (Tenn. Crim. App. Aug. 12, 1988) (holding that there was no prosecutorial misconduct in prosecutor's rebuttal argument that the defendant "was entitled to call character witnesses" when "it was made in response to defense counsel's argument that the [S]tate had failed to rebut the defendants' testimony"); see also United States v. Wimbley, 553 F.3d 455, 461-62 (6th Cir. 2009) (holding that "the prosecutor's argument that the defense had the opportunity to test for fingerprints or DNA, but did not do so" was "a proper response to defense counsel's statements that the government had not performed proper testing of the evidence"). Accordingly, we determine that this issue is without merit.

CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE